The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

Joshua C. LAWRENCE, Defendant–Appellant.

No. 99CA2431.

Colorado Court of Appeals, Div. III.

Dec. 6, 2001.

As Modified on Denial of Rehearing Feb. 28, 2002.

Certiorari Denied Oct. 15, 2002. *

---

* Justice KOURLIS does not participate.

Ken Salazar, Attorney General, John T. Bryan, Assistant Attorney General, Denver, CO, for Plaintiff–Appellee.

David S. Kaplan, Colorado State Public Defender, Andrew C. Heher, Deputy State Public Defender, Denver, CO, for Defendant–Appellant.

Opinion by Judge JONES.

Defendant, Joshua C. Lawrence, appeals the judgment entered on jury verdicts finding him guilty of twenty-seven counts of willful destruction of big game under § 33–6–117, C.R.S.2001. We affirm.

### I.

Defendant first contends that the trial court erred when it declined to suppress statements he gave to Department of Wildlife officers. He argues that he was in custody at the time of the interview and that the People failed to meet their burden of demonstrating that he knowingly, voluntarily, and intelligently waived his right to remain silent. We disagree.

An accused's statement during interrogation in a custodial setting is inadmissible unless it is provided pursuant to a valid waiver, which is made knowingly, voluntarily, and intelligently. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *People v. Owens*, 969 P.2d 704, 707 (Colo.1999). The court must determine whether an accused was in custody by considering the totality of the circumstances, based on whether "a reasonable person in the suspect's position would consider himself deprived of his freedom of action in a significant way at the time of questioning." *People v. Breidenbach*, 875 P.2d 879, 885 (Colo.1994)(citing *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

Here, the record reflects that defendant came to the sheriff's office voluntarily. When he arrived, the officers did not handcuff or search him. They escorted him to an interview room, where he sat nearest the unlocked door, across a table from the Department of Wildlife officers. Except for brief periods when a third officer stood inside the room near the door, defendant had clear access to the door. The officers did not tell defendant that he was under arrest, and defendant did not ask whether he was under arrest. We conclude that the officers, thus, elicited defendant's voluntary cooperation through noncoercive questioning. *See People v. Trujillo*, 773 P.2d 1086 (Colo.1989).

During the interview, defendant did not express any concern that he might be under arrest. At the conclusion of the interview, the officers allowed defendant to leave. A short time later, defendant voluntarily returned to deposit his gun with the sheriff's office.

The trial court found by a preponderance of the evidence that the interview was consensual and that a reasonable person in the same situation would not have considered it a custodial interrogation. We will not disturb that finding. Under these circumstances, a reasonable person would not have considered his freedom of action limited in a significant way at the time of questioning. *See People v. Breidenbach, supra.*

Because defendant was not in custody, his statements were consensual, and the officers were not obligated to advise him of his rights under *Miranda*. Therefore, we need not

consider whether defendant waived his rights under *Miranda*.

## II.

Defendant next contends that the trial court erred when it denied his motion for a bill of particulars. He argues that, in denying his motion, the trial court violated his constitutional rights to due process. We disagree.

A bill of particulars is intended to enable the defendant to properly prepare his defense in cases where the [information], although sufficient to advise the defendant of the charges raised against him, is nonetheless so indefinite in its statement of a particular charge that it does not afford the defendant a fair opportunity to procure witnesses and prepare for trial. *Erickson v. People*, 951 P.2d 919, 921 (Colo.1998)(citing *People v. District Court*, 198 Colo. 501, 504, 603 P.2d 127, 129 (1979)). The bill of particulars is intended to define the charged offense with more specificity, but it need not disclose in detail the evidence upon which the prosecution expects to rely. *Erickson v. People, supra*. The decision to grant or deny a request for a bill of particulars is vested in the sound discretion of the trial court, and its ruling will not be disturbed on review absent an abuse of that discretion. *People v. Laurson*, 15 P.3d 791 (Colo.App.2000); *People v. Atencio*, 780 P.2d 46 (Colo.App.1989). The trial court abuses its discretion in this regard only if its ruling is manifestly arbitrary, unreasonable, or unfair. *People v. Mandez*, 997 P.2d 1254, 1262 (Colo.App.1999).

In the complaint and information, the People charged defendant with the willful destruction of each of thirty-four animals found. During discovery, the People provided defendant with a list entitled "Animals Found—Master List," which identified the killed and abandoned animals that the People relied upon to define the charges against defendant. The Master List identified the species and sex of each animal found, its location and the types of wounds it suffered, how long the animal had been dead, the time the officers discovered the animal, the identity of the officers, and any shell casings or other debris found near the carcass.

Thus, as the People argue and the trial court found, the complaint and information, combined with the Master List, provided defendant with sufficient information to prepare a defense and to procure witnesses. Accordingly, the trial court did not abuse its discretion by denying defendant's motion for a bill of particulars.

## III.

Defendant further contends that the trial court erred and violated his due process and confrontation rights by finding unavailable a codefendant who exercised his Fifth Amendment rights to avoid testifying in this case, and admitting the codefendant's out of court statements, made during a non-custodial interview with DOW officers, without defendant having an opportunity to cross examine the statements. We perceive no error.

### A.

The test for a hearsay statement that would not deprive a defendant of his constitutional right to be confronted with the witnesses against him is whether "the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility." *People v. Farrell*, 34 P.3d 401, 405 (Colo.2001) (quoting *Lilly v. Virginia*, 527 U.S. 116, 136, 119 S.Ct. 1887, 1900, 114 L.Ed.2d 117, 134 (1999)). Based on the three-part analysis set forth in *People v. Newton*, 966 P.2d 563 (Colo. 1998), we determine whether the codefendant's earlier testimony was admissible here. See also *People v. Farrell, supra*.

Initially, the declarant must be unavailable. *See* CRE 804(a). Here, we conclude that the codefendant was unavailable to testify, having exercised his Fifth Amendment privilege when called to testify at defendant's trial.

Secondly, we must determine whether the statements sought to be admitted were against the codefendant's penal interests. In this part of the analysis, we

consider whether a reasonable person in the declarant's position would not have made the statement unless he or she believed it to be true. A statement against penal interest is admissible provided that the statement is not so self-serving as to be unreliable and the declarant did not have significant motivation to curry favorable treatment. *People v. Newton, supra.*

■ Here, the record reveals that during the DOW interview, after first denying any involvement, the codefendant confessed to his own willful destruction of wildlife, as well as that of defendant and of others. Additionally, the codefendant expressed that he understood that he had done something wrong and that he would face criminal charges for his actions.

We conclude that, under the circumstances, a reasonable person in the codefendant's position would not have made these statements unless he believed them to be true. We further conclude that his statements were not so self-serving as to be unreliable and that he did not have a significant motivation to curry favor with the authorities.

■ Thirdly, we consider whether, in the surrounding circumstances under which the statements were made, there existed particularized guarantees of the statements' trustworthiness, to assure that there was no material departure from the purposes underlying the right of confrontation. *People v. Farrell,* supra; *People v. Aguirre,* 839 P.2d 483 (Colo.App. 1992).

■ In *Farrell,* the supreme court sets forth several factors to consider when assessing a hearsay statement's trustworthiness: (1) whether the statement was truly self-inculpatory; (2) whether the statement was detailed; (3) whether police officers threatened or coerced the defendant to make the statement; (4) whether the confession was offered in exchange for leniency; (5) whether the declarant was likely to have personal knowledge of the events in the statement; (6) whether the declarant made the statement shortly after the described events; (7) whether the declarant had a reason to retaliate against the defendant;

and (8) whether the declarant was mentally or physically unstable at the time of the confession.

*People v. Farrell, supra,* 34 P.3d at 406 (citing *Stevens v. People,* 29 P.3d 305 (Colo. 2001)).

■ Here, as stated above, the codefendant's statements were truly self-inculpatory. The assertions were made without the benefit of any promises of leniency or other considerations from the DOW officers.

In addition, the record reveals that the codefendant provided detailed information concerning the offenses in which he participated with defendant, proving that he had personal knowledge of the events he described. He described the weapons and ammunition used; the types and numbers of animals each man killed; the vehicles they drove; and the technique they used to kill the wildlife, including, who drove, who shot, and who illuminated the animals in the dark.

The record shows that the codefendant was not nervous or upset during the interview, that he had no difficulty in understanding and answering the officers' questions, and that the doorway to the interview room was never blocked, eliminating any implication that he was not free to leave.

Furthermore, near the end of the interview, the codefendant asserted that he and defendant had spoken before they voluntarily granted interviews to the DOW and that they had agreed that they would be straightforward about the events, thus revealing that the codefendant did not intend to retaliate against defendant.

**B.**

■ Defendant argues that the state did not demonstrate that the codefendant was unavailable under CRE 804(a) because the codefendant testified in a hearing in his own case. Because no transcript or testimony was presented as to codefendant's testimony in that case, the record here is not sufficient to show that any such testimony actually reveals that he waived his Fifth Amendment privilege.

Therefore, we conclude that the trial court did not err nor violate defendant's due process and confrontation rights by finding the codefendant unavailable.

## IV.

■ Defendant also contends that the trial court erred when it instructed the jury that "knowingly" was the culpable mental state for the charged offenses of willful destruction of wildlife. We disagree.

■ Defendant did not raise any objections to this jury instruction at trial. If a defendant lodges no objection to a trial court's jury instruction, a plain error standard should be applied in reviewing the instruction. *People v. Garcia*, 28 P.3d 340 (Colo.2001). Under the plain error standard, a defendant must "demonstrate not only that the instruction affected a substantial right, but also that the record reveals a reasonable possibility that the error contributed to the defendant's conviction." *Bogdanov v. People*, 941 P.2d 247, 255–56 (Colo.1997).

■ The court's purpose in construing a statute is to give effect to the General Assembly's intent. *Martin v. People*, 27 P.3d 846 (Colo.2001).

The General Assembly stated its intent in enacting § 33–6–117 as follows: "The purpose and intent of this section is to protect the wildlife of this state from wanton, ruthless, or wasteful destruction or mutilation for their heads, hides, claws, teeth, antlers, horns, internal organs, or feathers or any or all of the foregoing, and the provisions of this section shall be so construed." Section 33–6–117(2), C.R.S.2001.

When defendant and others slaughtered numerous deer and antelope and left the carcasses to rot where they fell, they participated in "wasteful destruction" of those animals. The General Assembly explicitly condemned this conduct when it passed § 33–6–117.

■ When the language of a statute is unambiguous, we presume it expresses the intent of the General Assembly, and we will apply it as written, without resort to other interpretive rules of construction. *People v.*

*Shinaut*, 940 P.2d 380 (Colo.1997). However, when the language of a statute is ambiguous, the court may turn to other rules of construction.

In pertinent part, the statutory language reads:

it is unlawful for any person to hunt or take, or to solicit another person to hunt or take, any wildlife and detach or remove, *with the intent to abandon the carcass or body*, only the head, hide, claws, teeth, antlers, horns, internal organs, or feathers or any or all of such parts *or to kill and abandon any wildlife.*

Section 33–6–117(1), C.R.S.2001 (emphasis added).

Here, in arguing that the General Assembly affixed a specific intent mens rea to the offenses on which he was charged, defendant questions whether the phrase "with the intent to abandon the carcass or body" modifies the entire sentence, or whether that phrase modifies all but the last part, "or to kill and abandon any wildlife." The People assert that the "intent" phrase is a subordinate clause within the element "detach or remove . . . only the head, hide, claws, teeth, antlers, horns, internal organs, or feathers" and, therefore, modifies only these elements.

We recognize that Colorado courts no longer apply the rule of statutory construction that relative and qualifying terms be construed to refer solely to the last antecedent phrase with which they are closely connected, unless contrary legislative intent appears. Section 2–4–214, C.R.S.2001; *see People v. Myers*, 714 P.2d 513 (Colo.App. 1985). Nonetheless, we agree with the People, because we conclude that within the statutory context in which § 33–6–117 is found, the General Assembly intended that the phrase "or to kill and abandon any wildlife" be read to stand on its own.

■ "We are required, under another well known and universally recognized rule of construction, in ascertaining the intent of a legislative body, and the meaning of its enactments, to give effect to every word, phrase, clause, sentence and section, if it can be done, and we are not to presume that the legislative body used the language idly and

with no intent that meaning should be given to its language." *City & County of Denver v. Taylor,* 88 Colo. 89, 94–95, 292 P. 594, 596 (1930); *see People v. Swain,* 959 P.2d 426, 433 (Colo.1998)(Bender, J., dissenting)(quoting *State v. Graves,* 269 S.C. 356, 237 S.E.2d 584 (1977)).

Giving proper effect to all of the words of the provisions in § 33–6–117 requires recognition that the General Assembly has established two separate offenses. With the words, "to hunt or take ... any wildlife and detach or remove, with the intent to abandon the carcass or body, only the head, hide, claws, teeth, antlers, horns, internal organs, or feathers or any or all of such parts," the General Assembly has made it an offense to hunt or kill an animal with the intent to keep only certain parts and to abandon the rest of the carcass. The second offense is found in the words, "or to kill and abandon any wildlife." This offense involves only the killing and abandoning of an animal without regard for the actor's purpose or intention.

▮ The General Assembly did not prescribe a particular mens rea for this second offense. When a statute does not contain an explicit statement of the culpable mental state required for a conviction, its silence on the element of intent is not necessarily to be construed as an indication that no culpable mental state is required. Rather, the mental state is to be inferred from the statute. *People v. Hart,* 658 P.2d 857 (Colo.1983); *see People v. Moore,* 674 P.2d 354 (Colo.1984)(concluding that "knowingly" implied by counterfeit controlled substances statute); *People v. Bridges,* 620 P.2d 1 (Colo.1980)(inferring mental state "knowingly" from "make-my-day" statute), *overruled in part on other grounds by People v. Jeffers,* 690 P.2d 194 (Colo.1984).

We conclude that the mental state "knowingly" is implied by the second offense set forth under § 33–6–117, namely "to kill and abandon any wildlife." The "knowingly" mental state is implied first because the first crime set forth in the statute is expressly assigned as a specific, not general, intent crime. Thus, had the General Assembly intended to make the second enumerated offense a specific intent crime, it would have done so. Secondly, the language of the second offense in § 33–6–117 logically requires "knowing" that one killed and abandoned wildlife. Nothing in that language logically is tied to "specific intent," "recklessness," or "neglect." *See People v. Moore, supra.*

In this case, defendant was charged with the killing and abandonment of wildlife, the second offense of § 33–6–117. He was not charged with the hunting or taking of wildlife and detaching or removing portions of the carcass with the intent to abandon the carcass or body thereafter. Therefore, the trial court properly instructed the jury to apply the culpable mental state of "knowingly."

Thus, the trial court did not err in instructing the jury that the culpable mental state for the willful destruction of wildlife is "knowingly."

## V.

▮ Defendant further contends that the trial court erred in not requiring the prosecution to elect which incidents supported each count of willful destruction of wildlife and in not instructing the jury on verdict unanimity. Defendant argues that the jury may not have agreed on which specific animal he was accused of killing and abandoning with respect to each count and that the jury might have rendered guilty verdicts without a unanimous agreement as to the conduct supporting each conviction and each acquittal. We disagree.

▮ When evidence of many acts exists, any one of which would constitute the offense charged, the People may be compelled to select the transaction on which it relies for conviction or, in the alternative, the jury should be instructed that to convict the defendant, it must have unanimous agreement either that defendant committed the same act or acts, or that defendant committed all the acts included within the time period charged. *Thomas v. People,* 803 P.2d 144 (Colo.1990); *People v. Estorga,* 200 Colo. 78, 612 P.2d 520 (1980).

▮ Because defendant did not request that the prosecution make an election and did not submit a unanimity instruction, we must apply a plain error standard of review. *See*

*People v. Williams*, 899 P.2d 306 (Colo.App. 1995). Under that standard, the error must so undermine the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *People v. Kruse*, 839 P.2d 1 (Colo.1992).

The *Estorga* case involved charges against a defendant for sexual assaults on a child over the course of several months. The People failed to select a specific act or acts upon which the jury could convict. The supreme court concluded that it was reversible error to fail to require the People to so select a specific act when there was evidence of more than one transaction and there could be some doubt as to which transaction each individual juror relied upon for conviction.

In *Thomas v. People, supra*, the supreme court noted that when the evidence does not present a reasonable likelihood that jurors may disagree as to which act the defendant committed, the People need not designate a particular instance upon which to argue for conviction. However, if the People do not designate an instance, the jurors should be instructed that they must unanimously agree either that the defendant committed the same act or that the defendant committed all of the acts described. *Thomas v. People, supra.*

Here, the acts for which the jury found defendant guilty consist of willful destruction of wildlife, and the jury was instructed that it could use the theory of complicity in considering defendant's guilt or innocence.

To be guilty of willful destruction of wildlife, a defendant must "kill or abandon any wildlife." Section 33-6-117(1). It is a class five felony to kill and abandon "big game." Section 33-6-117(1)(a), C.R.S.2001. "Big game" includes deer and antelope under § 33-1-102(2), C.R.S.2001.

■■■ A complicitor "is legally accountable as a principal for the behavior of another constituting a criminal offense if, with the intent to promote or facilitate the commission of the offense, he or she aids, abets, advises, or encourages the other person in planning or committing the offense." Section 18-1-603 C.R.S.2001. Complicity does not require

a separate charge. *People v. Thompson*, 655 P.2d 416 (Colo.1982).

In this case, before the jury could find defendant guilty of the twenty-seven counts, the People had to prove beyond a reasonable doubt that defendant himself killed and abandoned an antelope or a deer for each count charged, or that, with the intent to facilitate or promote the killing and abandonment of the wildlife, he aided, abetted, advised, or encouraged another in killing and abandoning an antelope or a deer for each count charged. *See* § 18-1-603.

The record shows that, here, to convict defendant, the prosecution presented the evidence so as to interconnect an individual animal with each count charged. The record reflects clearly the demonstrated interconnections among the details contained in: (1) the interview transcripts of defendant and the codefendant; (2) the map showing the locations and the numbers assigned to each animal destroyed; (3) the photographs numbering the animals according to the map locations and giving the time and place the animal was found and the identity of the officers that found the carcass; and (4) the Master List, which identified the animals that defendant was charged with destroying. Viewed as a whole, and in the light most favorable to the People, the record reveals that, as to each charge for which defendant was convicted the People presented sufficient evidence to support a conclusion by a reasonable person that defendant participated in the willful destruction of each of the individual animals charged, either as a shooter or as a complicitor. The People's approach to presenting the evidence as to each individual animal charged in each count sufficiently interlocks to support the jury's unanimous conclusions that defendant was guilty of the individual counts charged beyond a reasonable doubt.

Unlike in *Estorga* and *Thomas*, where several acts could have constituted the individual crimes, here, only one discrete act could constitute each crime. Further, the interconnected evidence relating to each animal was clear and definite. Therefore, it is unlikely that jurors could disagree or be confused as to which acts of killing defendant committed

or assisted in. Under these circumstances, there was no need for the prosecution to make an "election," or for a unanimity instruction. *See Thomas v. People, supra.*

■ Additionally, certain instructions presented to the jury persuade us that it was not necessary either to require the prosecution to elect or to extensively instruct on unanimity.

The record reflects that the jurors were instructed that proof must be presented as to each element of every charge beyond a reasonable doubt. They were instructed that each of the thirty-four verdict forms must represent a unanimous verdict of the jury, and that: "Each count charges a separate and distinct offense and the evidence and the law applicable to each count *should be considered separately,* uninfluenced by your decision as to any other count" (emphasis added).

The interconnected evidence, the instructions, and the fact that the jury acquitted defendant on seven counts based on strong evidentiary rationale, lead us to conclude that the jury reached unanimous verdicts on all counts.

Therefore, the trial court did not commit error that so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction.

Based on the foregoing, we also reject defendant's related contention that the trial court erred and violated the constitutional prohibition against double jeopardy when it failed to require an election or, in the alternative, to instruct the jury concerning unanimity.

## VI.

Defendant finally contends that the totality of the evidence was insufficient to sustain the jury's guilty verdicts and that, therefore, the convictions should be vacated. We disagree.

■ When the sufficiency of the evidence is challenged on appeal, our task is to determine whether the evidence, viewed as a whole and in the light most favorable to the prosecution, is sufficient to support a conclusion by a reasonable person that the defendant is guilty of the crimes charged beyond a reasonable doubt. *Kogan v. People,* 756 P.2d 945, 950 (Colo.1988).

The record plainly shows that, when viewed in a light most favorable to the prosecution, the totality of the evidence amply supports the verdicts rendered by the jury that defendant was guilty of each count on which he was convicted beyond a reasonable doubt. Accordingly, this contention must fail.

The judgment is affirmed.

NIETO and STERNBERG **, JJ., concur.